## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 1:21-cr-00097 (PLF) |
| v. : | |
| : | |
| VALERIE EHRKE, : | |
| : | |
| Defendant. : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Valerie Ehrke to a probationary term of three years, 40 hours of community service, and $500 in restitution.

I.   **Introduction**

The defendant, Valerie Ehrke, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage. The government is requesting a probationary sentence in this unusual case based on the fact that the defendant was inside of the Capitol for only about a minute; entered only about fifteen feet into the building; did not engage in any destruction of property or violence; and had limited social media activity regarding the event.

The defendant stands before this Court to be sentenced on a misdemeanor conviction, but her conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the

1

Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed.

**II.     Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 15, at 1-3. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

*Valerie Ehrke's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Ms. Ehrke traveled to Washington, D.C., from her home near Sacramento, California. The next day, she and a friend attended a rally for former President Donald Trump, where they heard Mr. Trump speak. She heard Mr. Trump tell the crowd to go to the U.S. Capitol. At first, the defendant instead went back to her hotel room. However, when she saw a news story about how people were going to the U.S. Capitol, she decided she wanted to be part of the crowd. She began walking to the Capitol. As she walked to the Capitol, she began recording videos and uploading them to Facebook, including a video showing other people walking to the Capitol. In a caption to that video, she wrote that she was "on the way to the breached capitol building [sic]."

The defendant eventually made it to the Capitol building. At approximately 3:11 p.m.,[1] she entered the building through the North Door, which is on the first floor of the Senate wing of

---

[1] In the Statement of Offense, the time given is approximately 2:09 p.m. That time was based on a video in which the time stamp was not Eastern Standard Time. Other video, which has been disclosed to the defense, subsequently established that the time was approximately 3:11 p.m. EST.

the building. It is a set of double doors. The doors were already open at the time, and the defendant followed many others through the entrance. That door opens into a hallway. The defendant filmed her entrance through this door and into the hallway. As Ms. Ehrke is entering the building, one can hear an alarm sounding throughout the Capitol: a loud, high-pitched, continuous beeping, similar to a smoke alarm. Surveillance video also shows Ms. Ehrke's entrance. The defendant travels a very short distance—she later estimated about fifteen feet—before she had to stop at the back of the crowd. The police then confront the front of the crowd and begin pushing everyone back through the hallway back towards the North Door. During that time, everyone is pushed back through the door, including the defendant, who was still near the back of the crowd, behind multiple rows of rioters. The force of the crowd pushes her back out the North Door and out of the building. All told, the defendant was in the building for approximately one minute.

After she left the building, Ms. Ehrke wrote on Facebook about the events at the Capitol and posted videos for others to see. When she posted the above-referenced video that she took of her and others in the hallway, she added this caption: "We made it inside, right before they shoved us all out. I took off when I felt pepper spray in my throat! Lol." A screenshot of that post is reproduced below. The government would note that the defendant's Facebook profile picture in the screenshot below is a flaming "Q," which is commonly associated with QAnon, a far-right conspiracy group:



On January 12, 2021, the defendant voluntarily interviewed with the FBI. She gave a detailed description of her travel to Washington, D.C. and of her involvement in the events of January 6. She admitted to the facts outlined above, including that she had traveled to Washington, D.C. to hear Mr. Trump speak, that she had originally gone back to her hotel room before deciding that she wanted to be part of the crowd at the Capitol, and that she had briefly entered the Capitol and traveled about fifteen feet inside of the building. Ms. Ehrke's statements to law enforcement are consistent with CCTV footage from the Capitol. She also stated that she did not see who breached the Capitol building or how they did so.

In a subsequent letter to the government, which was also submitted to the PSR writer, Ms. Ehrke also indicated remorse about what happened at the Capitol that day. She stated that she did not know about "the madness" that was happening inside of the Senate Chamber. She also stated that she does not condone the behavior of people who participated in that madness, and she is "deeply sorry that people lost their lives on that day." Ms. Ehrke also submitted other materials that highlight her long-standing involvement in several community organizations in her town and the surrounding area in California, including letters of support from several residents of that area.

The defendant was one of the first defendants to plead guilty in connection with the events of January 6. At a change of plea hearing on June 30, 2021, the defendant admitted that she knew she did not have permission to enter the Capitol building and that she acted with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress. *See* Statement of Offense ¶ 10. She also admitted to writing the Facebook post that is depicted in the above screenshot, which is memorialized in the Statement of Offense.

*The Charges and Plea Agreement*

On January 16, 2021, Ms. Ehrke was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On January 19, 2021, she self-surrendered to authorities in the Sacramento area. On February 9, 2021, she was charged by Information with the same crimes. On June 30, 2021, she pled guilty to Count Four of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G). In her plea agreement, she agreed to pay $500 in restitution.

### III. Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000.[2] As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV. Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). We therefore turn to these factors.

#### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events. So, too, does the conviction this defendant now faces. Picketing, demonstrating, or parading at the Capitol as part of the riot on January 6 is not like picketing at the Capitol some other day, without other rioters present.

---

[2] Because Ms. Ehrke has pled guilty to a petty offense, a term of supervised release is not authorized. *See* 18 U.S.C. § 3583(b)(3).

6

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each individual person who entered the Capitol on January 6 did so under the most extreme of circumstances. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement and likely would have smelled chemical irritants in the air. Make no mistake, no rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

In this case, Ms. Ehrke briefly entered the Capitol, with a larger crowd, through a set of double doors. Certainly, this conduct alone was wrong given the overall context that day. In the video in which Ms. Ehrke enters the building, one can hear the beeping alarm that is similar to a smoke alarm sounding throughout the Capitol. Ms. Ehrke also evidenced that she knew the general situation when she posted, on her way to the Capitol, that she was "on the way to the *breached*

7

capitol building [sic]" (emphasis added). Indeed, she would have known about the general situation at the Capitol because she decided to go there after watching a news report. In addition, once she started entering the Capitol, she was sufficiently excited to take out her cell phone and begin filming the event. Later that day, she posted the video online.

On the other hand, however, the defendant was in the building for only about a minute. She only made it about fifteen feet into the building. The entirety of Ms. Ehrke's entry in the Capitol is captured on CCTV and there is no evidence that the defendant engaged in any violence or destruction of property during her very brief entry of the Capitol; nor that she destroyed evidence after the riot. She voluntarily interviewed with the FBI and told them about her actions that day in detail. And she has stated to the government and to the PSR writer that she does not condone "the madness" that she now knows occurred in the Senate Chamber. She also has expressed remorse that people lost their lives that day.

Given Ms. Ehrke's brief and limited entry into the building, lack of participation in any assaultive or destructive conduct, cooperation with law enforcement, and expressions of remorse for what happened that day, this factor weighs in favor of a probationary sentence.

### B. The History and Characteristics of the Defendant

As set forth in the PSR, Ms. Ehrke's criminal history consists mostly of traffic violations and similar offenses. (ECF No. 18 ¶¶ 26-34.) She has one conviction for selling and/or transporting marijuana/hash. (ECF No. 18 ¶ 28.) If the Sentencing Guidelines did apply to her offense of conviction, she likely would have zero points. USSG §§ 4A1.1(c) & n.3; 4A1.2(c)(2). Accordingly, she would be in Criminal History Category I. USSG §§ 4A1.1, 5A. This factor supports a more lenient sentence.

In addition, the defendant has submitted numerous letters from members of her community that attest to her character and to her activities within the community. This activity includes involvement in many community organizations, including those that work on local projects, events, the design of community facilities, and town beautification initiatives. The defendant herself underscores these activities in her own letter and explains her motivations for doing so.

The government also notes that Ms. Ehrke expressed an interest in pleading guilty very early—she was one of the first defendants charged in connection with the Capitol riots to do so. She acknowledged her conduct in an interview with the FBI and a subsequent letter to the government. When recommending an appropriate sentence, the government gives significant weight to the defendant's early resolution of this case.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] In most cases arising out of the riot on January 6, 2021, including in most misdemeanor cases, this factor supports a sentence of incarceration. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected."). Although this specific factor weighs in favor of incarceration,

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

the other factors identified in this memorandum indicate that probation is a more appropriate outcome in this unusual case.

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010). The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demand deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the

democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

On one hand, Ms. Ehrke's words on January 6 highlight the need for deterrence. She acknowledged that she knew the Capitol building had been breached when she wrote that she was "on the way to the breached capitol building [sic]," yet she went there anyway. She posted a video for others to see in which she entered the building with other rioters, writing "Lol" at the thought that law enforcement had to pepper spray individuals in an attempt to try to control the situation. This course of conduct shows a troubling lack of understanding, at least at the time, regarding the extreme seriousness of the situation.

However, as discussed above, Ms. Ehrke's actions at the Capitol that day were much more limited than most individuals, and she has since expressed remorse for what happened on January 6. She has stated that she does not condone "the madness" that others participated in and that she is "deeply sorry that people lost their lives on that day." She has shown that she takes this incident seriously through her ready cooperation with the FBI and through her subsequent letter to the government. Although the need to deter what happened in general on January 6 favors incarceration, the facts of Ms. Ehrke's specific case and her subsequent actions favor probation.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress. Each offender must be sentenced based on their individual circumstances, but with the backdrop of January 6 in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor

defendants will generally fall on the lesser end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence, although recommended here for the reasons stated above, should not necessarily become the default. Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19. At this time, no unwarranted sentencing disparities exist, nor does the government's request create one. This is the rare case where a probationary sentence is appropriate.

## V.     Conclusion

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a).  As detailed above, some of those factors support a sentence of incarceration, but most of them support a more lenient sentence.  Balancing these factors, the government recommends that this Court sentence Valerie Ehrke to three years of probation, 40 hours of community service, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing her very brief entry into the Capitol and her early acceptance of responsibility.  It also allows continued monitoring of Ms. Ehrke in the event of future participation in similar conduct.

    Respectfully submitted,

    CHANNING D. PHILLIPS
    ACTING UNITED STATES ATTORNEY

By:     */s/ Kevin Birney*
    KEVIN BIRNEY
    U.S. Attorney's Office for the District of Columbia
    D.C. Bar No. 1029424
    555 4th Street, N.W.
    Washington, D.C. 20530
    202-252-7165
    Kevin.birney@usdoj.gov